### W. L. PHILLIPS v. SALEM IRON WORKS.

(Filed 27 November, 1907).

1. **Employer and Employee—Safe Place to Work—Safe Appliances.**
    The usual measure of duty imposed upon the employer requires him to furnish to his employee a reasonably safe place to work and such reasonably safe appliances as are known, approved and in general use.

2. **Same—Safety Appliances—Duty of Employer—Questions for Jury.**
    When it is admitted or the jury find that standard safety appliances are known, approved and in general use in respect to the particular character of machinery furnished, or upon which plaintiff is employed, the law imposes the duty upon the employer to furnish such appliances, this being the standard of duty. When the evidence in this respect is conflicting, or the inference to be drawn from it doubtful, the question should be submitted to the jury, under proper instructions in regard to the standard of duty.

146—14

CIVIL ACTION, tried before *Ferguson, J.,* and a jury, at March Term, 1907, of the Superior Court of FORSYTH County.

From judgment for defendant plaintiff appealed.

Action for damages alleged to have been sustained by plaintiff by reason of defendant's negligence. There was a verdict and judgment for defendant. Plaintiff noted exceptions to the charge and appealed.

The facts pertinent to the exceptions and the decision of the appeal are: Defendant company, in connection with its other business, made "dry cans," which were used in woolen mills to dry yarn after it had been dyed. It was necessary that they should be steam-tight in order that they could be filled with steam, and heat the surface so that yarns would dry. They were cylindrical in shape, 6 or 7 feet long and from 1 foot to 1½ feet across the ends, with iron heads and bands shrunk around the heads. The manner of testing the cans for leaks was as follows: The cans, after having the iron heads strongly fastened on by shrinking an iron band around them, were taken outdoors, near the boiler house, and a pipe connected with the boiler would carry steam into an opening at one end of the cans, this opening being half an inch in diameter. On the pipe taking the steam into the can there was a steam cock to turn off the steam, the amount of steam passing through the pipe depending on how far this valve or cock was turned. There was also on this pipe a steam gauge to indicate the amount of steam pressure passing through the pipe into the can. In order to test the cans it was necessary to hold the pressure at from 10 to 15 pounds, the cans being capable of standing a pressure of 50 pounds. After the steam had been let into the can, the can was struck with a hammer in the hands of the person whose business it was to see if there were any leaks, the stroke of the hammer being intended to indicate the leaks by the steam coming out. At the opposite end of the can into which the steam came there

was a pipe sticking out, with an outlet 1 inch in diameter, and at this end, to regulate the amount of steam pressure, the plaintiff was at work with a piece of scantling pressed against a stob in the ground, or the toe of his foot, as he chose; upon the scantling there was nailed a piece of leather, and at the point where the leather was nailed the scantling was pressed against the outlet. It was his business to watch the steam gauge at the other end, which was some 6 or 8 feet from him, and, by turning the scantling from side to side, reduce or increase the pressure. While at work, for some reason, the head blew out and the scantling struck the plaintiff·on the head.

Plaintiff alleged that defendant was negligent, in that it failed to provide a safety valve which was in general use by those performing this class of work, so that the steam would automatically escape beyond the pressure desired. There was evidence tending to show that safety valves are in common use wherever any pressure is used in the form of steam or water; that they are used on everything that contains a pressure in order to make it safe. It is very important to have a safety valve there when one would not know the condition of the steam gauge; it may be right or it may be wrong. It is proper to use a safety valve on a machine when testing it. One could not guarantee it unless a safety valve was on it. It was not safe to test the cylinder with steam·without using a safety valve. It is dangerous, for the simple reason that a steam gauge cannot be adjusted as quickly as steam will adjust itself. Steam itself will find a way out of a boiler quicker than one can turn it out if the proper spring is waiting for it at the point to take action. A steam gauge is no safety whatever on a boiler. It simply gives you time to get away before it blows up. A safety valve is simply to take care of you while around the boiler. It is not safe for a man to stand at this end of this cylinder here and adjust it with a stick and tell by looking at that gauge what pressure of steam was in the cylinder, if he did that constantly.

A witness testified: "I understand the use of a safety valve. It is used to carry a certain amount of pressure in the boiler and give number of pounds to the square inch. It is set for the purpose required. It works automatically. When it gets to the given pounds of pressure it is set back and relieves the pressure itself. If it is set for 10 pounds pressure and the pressure becomes more than 10 pounds, it blows off. Safety valves are in general use in steam machinery or vessels charged with steam. I do not remember ever seeing a boiler that did not have some kind of a safety valve on it. If a safety valve had been on the can, set for 10 pounds, and more then 10 pounds came into the pipe leading to the can, it would have relieved itself. It is the general use to have safety valves on all vessels carrying steam."

There was evidence that safety valves corrode and fail to operate. There was also evidence that the way provided for plaintiff to do the work assigned to him was safe; that the steam gauge indicated the amount of steam in the boiler. There was no evidence of any defect in the material of which the boiler was constructed.

Defendant contended that plaintiff was guilty of contributory negligence. Both parties submitted a number of prayers for special instructions.

Among other instructions given by his Honor, he said to the jury that the duty of the employer was met if he furnished to his employee reasonably safe appliances for his work, etc. He further said: "If the gauge was a reasonably safe appliance, it does not make any difference that the defendant didn't furnish a safety valve; but if it was not reasonably safe without a safety valve, then it would be negligence on the part of the defendant not to furnish a safety valve, provided that you should find that safety valves were in common use in work of this kind." Plaintiff excepted. "When you come to consider the allegations of negligence directed at the fact that the defendant did not furnish a safety valve, I charge

you that you cannot find that the defendant was negligent in this respect, from the fact alone that you may find that if it had been adopted it would have had a tendency to decrease the risk and make the work safer; but in order to find the defendant guilty of negligence on account of this allegation, you must find from the evidence that a safety valve was so manifestly serviceable and necessary as to command the adoption thereof by reasonably prudent men in the same business so generally that it could not reasonably be ignored or disregarded." Plaintiff excepted.

*Watson, Buxton & Watson* and *Lindsay Patterson* for plaintiff.

*Manly & Hendren* for defendant.

CONNOR, J., after stating the facts: There can be no just criticism of his Honor's charge, in so far as he defines the duty of the master to furnish to his servant a reasonably safe place to work and reasonably safe appliances with which to perform the service. Plaintiff contends that he should have gone further and told the jury that when a safety appliance in the operation of dangerous instrumentalities is known, approved and in general use, the standard of duty fixed by the law requires the employer to furnish such appliance to his employee; that the use of such appliance became the standard of duty in respect to the safety of the employee; in other words, in contemplation of law, the reasonably prudent man will furnish to his employee such appliances as are known, approved and in general use, rather than rely upon his own judgment of what is reasonably safe. In applying this principle, care must be taken to correctly define the terms "known, approved and in general use," in respect to the extent and the time during which it is in such general use. The employer is not required to adopt every new appliance or invention which may be put upon the market. A sufficient number of persons for a sufficient length of time must be shown to have

approved and used the appliance to test its value and effi-
ciency to make it generally approved and used, within the
meaning of the term.    It must further appear that such appli-
ance is reasonably within the reach of the employer.    Apply-
ing the rule to the admitted facts and to plaintiff's evidence,
we have, for the purpose of passing upon the exception, this
case: Defendant, for the purpose of testing the capacity to
resist the pressure of steam for the purpose for which it was
made, attached the cylinder by means of an iron pipe one-half
inch in diameter to a boiler, and, by turning the valve, the
steam from the boiler rushed into the cylinder.    The cylinder
had a capacity to resist a pressure of 50 pounds.    The test
could be made by putting in it 10 to 15 pounds.    The boiler
had a generating capacity of 60 to 80 pounds of steam.    The
evidence tended to show that the valve was turned one-fourth
of an inch.    On the pipe a gauge was set, and plaintiff was
placed, for the purpose of discharging the duty imposed upon
him, 8 or 10 feet from the gauge.    At the end of the cyl-
inder and at the point at which plaintiff stood was an appli-
ance for turning off the steam if the gauge indicated too much
pressure.    This appliance was in charge of plaintiff.    The
cylinder exploded, as described by the witnesses, and injured
plaintiff.    Plaintiff insists, and introduced evidence tending
to show, that the known, approved and generally used method
of preventing an explosion of such a cylinder by reason of an
excess of steam was a safety valve.    His evidence tended to
show that a steam gauge was not reliable.    One witness said:
"A man cannot constantly look at a gauge without his eyes
getting so that the figures run together.    Looking at a gauge
five minutes, a man cannot tell one figure from another.    A
man cannot look at a gauge constantly at 10 and watch it stand
at 10 for five minutes and hold the pressure in, himself.    It
would not be safe to put any steam in there without having a
safety valve."    On the other hand, the defendant introduced
several witnesses who said that the gauge and arrangement

made for letting off the steam were safe and much better than a safety valve, giving reasons for their opinion. In this condition of the evidence the rule laid down by his Honor was clearly correct, and in this aspect of the case no just criticism can be made of the charge. But the plaintiff insists that he has gone further and shown, not only that a safety valve was the safer mode of letting off excessive steam, but that it was the method known, approved and in general use. The witnesses upon this point say that they have had experience in operating cylinders into which steam was put, and that it is usual to have a safety valve upon them; that this was the general custom. They explain by saying that if in any way a greater quantity of steam went into the cylinder than the valve was "set for," it would automatically open and the steam in excess of the quantity provided for would, as the witnesses say, "blow out." If the jury should find as a fact that the safety valve upon such cylinders or similar vessels into which steam is put and which were subjected to pressure was known, approved and in general use as a safety appliance, we are of the opinion that the defendant owed to plaintiff the duty of using it; that is, furnishing such appliance to plaintiff for his protection. In *Empson Packing Co. v. Vaughan*, 27 Col., 66, it appeared that a cylindrical apparatus called a cooker, made of iron, in which the vegetables previously canned were placed for the purpose of subjecting them to a sufficient degree of heat to complete the process of canning, was used. This was done by closing the cooker perfectly tight and turning in steam which was supplied from boilers through a pipe connecting the two. It was alleged in that case "that the explosion was due to the excessive pressure of steam confined in the cooker, which would have been avoided had it been provided with a safety valve so regulated as to allow the escape of steam upon reaching a pressure within the limits of safety, or the pipe connecting the cooker with the boiler had been equipped with a pressure regulator which would have auto-

matically prevented the pressure exerted by the steam reaching beyond a fixed point."

The Court says: "In some establishments safety valves were used; in others only the thermometer and gauge used by appellant.   *   *   *   Which of these appliances was the one which the exercise of reasonable care and prudence would adopt? Steam has ever been acknowledged as a dangerous agency, the use of which results in accidents, even when the most approved safety appliances are utilized. The cooker was connected directly with the boilers, and was only capable of withstanding a much less degree of pressure than the steam generated in these receptacles usually exerted. It was designed to be used with a safety valve. The thermometer and gauge on the cooker would not instantly indicate the pressure of the steam within it. The steam was only controlled by a globe valve on the pipe through which it was conducted to the cooker. Before any warning of dangerous pressure would be indicated by the thermometer and gauge, an explosion might occur." In that case there was no evidence that the safety valve was in general use; on the contrary, it appeared that both appliances were used. The Court held that the failure to furnish the safety valve was evidence of negligence for the jury. A verdict for the plaintiff was sustained. We do not hold in this case that the mere failure to furnish the safety valve as a safety appliance was, as a matter of law, negligence, but that if the jury find that it was known, approved and in general use, the failure to do so would be negligence. The testimony upon this question is conflicting and was properly submitted to the jury. The error consists in failing to direct the minds of the jury to the effect which they should give to the failure of defendant to have the safety valve, if they further found that it was known, approved and in general use. The principle which this Court has adopted, and which we think correct, is thus stated by *Mr. Justice Hoke* in *Bradley v. Railroad,* 144 N. C., 555: "When the employees are en-

gaged in the operation of mills and other plants having machinery more or less complicated and usually driven by mechanical power, in such case an arbitrary standard of duty has been fixed, and the employer is required to provide methods, placing, implements and appliances such as are known, approved and in general use," citing *Hicks v. Manufacturing Co.,* 138 N. C., 319; *Horne v. Power Co.,* 141 N. C., 50; *Fearington v. Tobacco Co.,* 141 N. C., 80. Defendant insists that no general use was shown. While it is true that the evidence does not show that others were engaged in the manufacture of cylinders or iron cans of the exact size, strength and character as the one in controversy, it does appear that when cylinders of similar kind, construction, etc., are in use, the known, approved and usual method of providing against danger from an explosion caused by excessive steam is to place upon them a safety valve, which, for the reasons given by the witnesses, would appear to be the most reliable safety appliance. It is impossible for courts to do more than apply the principles by which the duty of the employer is fixed to the cases as they arise. An examination of Labott's work on Master and Servant and the elaborate notes, together with the encyclopedias, shows the almost innumerable decisions applying the general principles to particular cases. While the courts are not disposed to unduly burden the industries of the country by imposing unreasonable or impracticable demands upon the employer, yet it is their duty to so declare and enforce the law that the lives and limbs of employees are rendered as safe as reasonable care can secure. It is in accordance with a humane and sound public policy that employers be required to exercise the degree of care known, approved and in general use. To require this imposes no hardship upon them. We have so held, and the law in that respect has been crystallized into a statute that railroad companies must do so. *Greenlee's case,* 122 N. C., 977; *Troxler's case,* 124 N. C., 189. There was evidence

CARDWELL *v.* RAILROAD.

tending to show that the method of testing the cylinder in use at the time of plaintiff's injury had been used for a long time without accident, and that it was not only reasonably safe, but to be preferred to the safety valve.    It may be that the jury did not find that the safety valve was approved and in general use on such cylinders as the one by the explosion of which plaintiff was injured.    If they had found otherwise, his Honor's instruction did not permit them to give to such finding the effect of imposing the duty to furnish the safety valve.  It is this omission of which plaintiff complains.    Defendant insists that the evidence, if believed, did not show a general use of the safety valve on such cylinders, citing *Marks' case,* 135 N. C., 287.    We think that there was evidence fit to be submitted to the jury upon the question.    Of course, its weight and value were for the jury.    For the error in the instruction in this respect there must be a

New Trial.